**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JULIE A. SU, ) | |
| ACTING SECRETARY OF LABOR, ) | |
| UNITED STATES DEPARTMENT OF LABOR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 2:21-cv-1391 |
| ) | |
| INTRA-NATIONAL HOME CARE, LLC, AND ) | |
| DILLI ADHIKARI, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS**

1. "Intra-National is a limited liability company and has a registered address … at Apartment 18 at 1620 Skyline Drive Pittsburgh, PA 15227." Amended Answer and Affirmative Defenses to Plaintiff's Complaint, (hereinafter "Amended Answer"), ECF 110, at ¶ 3.

2. Intra-National is "engaged in a domestic homecare business operating within this Court's jurisdiction." *Id.*

3. Intra-National's annual dollar volume of sales or business done exceeds $500,000.00. *Id.* at ¶ 6.

4. Defendant Dilli Adhikari is Intra-National's Chief Executive Officer, *id.* at ¶ 4, as well as its founder, Defendants' Answer, Affirmative Defenses, and Counterclaim to Plaintiff's Complaint, ECF 36 (hereinafter "Counterclaim") at page 9, ¶ 2.

5. During the relevant period, Adhikari has owned 100% of Intra-National. Defendants' Responses to Plaintiff's First Interrogatories, (hereinafter "Interrogatories"), attached as Exhibit A, at Interrogatory 10.

6. Adhikari holds a master's degree in business administration. Deposition of Dilli Adhikari (hereinafter "Adhikari Depo"), attached as Exhibit B, at 23:7-11.

7. Adhikari provides "overall leadership" to Intra-National. Deposition of Rup N. Pokharel, attached as Exhibit C, at 84:16-85:6.

8. Adhikari founded Intra-National in 2013 in Michigan. Adhikari Depo. at 11:22 – 12:3.

9. In 2015, Adhikari expanded Intra-National Home Care into Pennsylvania. *Id.* at 42:7-9.

10. Govinda Khatiwada is Intra-National's Administrator. Deposition of Govinda Khatiwada, attached as Exhibit D, (hereinafter "Khatiwada Depo") at 54:10-16.

11. Khatiwada reports directly to Adhikari. *Id.* at 54:1-6.

12. Meg Subedi has been Intra-National's Chief Financial Officer since 2016. Deposition of Intra-National Home Care, LLC pursuant to Federal Rule of Civil Procedure 30(b)(6), (hereinafter "30(b)(6) Depo") attached hereto as Exhibit E, at 28:8-17; Deposition of Meg Subedi, (hereinafter "Subedi Depo") attached hereto as Exhibit F, at 17:17-18 and 41:17-18.

13. Subedi reports directly to Adhikari. Subedi Depo at 55:13-14.

14. CFO Subedi oversees Intra-National's payroll. 30(b)(6) 99:17-25.

15. Adhikari gives Subedi specific instructions about how to oversee Intra-National's payroll and requires him to review every payroll. 30(b)(6) Depo at 28:18-23 and 99:17-25.

16. Rup Pokharel has been the Human Resources Manager at Intra-National since May 2018. Pokharel Depo at 24:19 – 25:7.

17. Pokharel interviewed with Adhikari and Subedi before Intra-National hired him. *Id.* at 25:8-22.

18. Pokharel reports directly to Adhikari. *Id.* at 47:5-6.

19. Adhikari, Subedi, and Khatiwada trained Pokharel about how to perform his job. *Id.* at 47:7-12.

20. Adhikari reviews Intra-National's payroll every quarter. Adhikari Depo at 171:6-11.

21. Adhikari controls FLSA compliance at Intra-National. *Id.* at 85:6-9.

<u>Intra-National's Business Model</u>

22. The Direct Care Workers (hereinafter "DCWs") at issue in this case "provide in-home care services to Intra-National's clients within Pennsylvania," Amended Answer at ¶ 7.

23. Intra-National's clients, (hereinafter "Clients" or "Consumers") require assistance with the tasks of everyday living because of age or disability. Answer and Counterclaim at ¶ 18.

24. Many Clients are eligible for in-home care pursuant to Pennsylvania's Medicaid Waiver Program, which is called Community Health Choices ("CHC"). Counterclaim at ¶ 1.

25. Clients in this program receive services according to a plan of care created by a managed care organization that ultimately reports to the Commonwealth of Pennsylvania. Khatiwada Depo at 27:2 – 28:4.

26. When a POC authorizes services by a DCW, the Clients do not obtain the DCW services directly from the Waiver Program. Instead, Clients obtain DCW services through a third-party provider such as Intra-National. *Id.* at 27:17 – 28:4.

27. Intra-National trains the DCWs to follow the plans of care. *Id.* at 63:2-6 and  63:22-25.

28. Intra-National's DCW Job Description defines a DCW as "one who provides direct care assistance to clients (consumers) in their home under the supervision of Intra-National Home Care, LLCs supervisor." Job Description of Direct Care Workers, attached as Exhibit G.

29. The DCWs assist the Clients with tasks such as cooking, cleaning, bathing, dressing, and eating. Initial Training Documents, attached as Exhibit H, at page 2; Job Description of Direct Care Workers.

30. DCWs have no direct contact with the managed care organizations or the government agencies involved in administering the Medicaid Waiver program. Khatiwada Depo at 50:19 – 51:1.

31. The job duties of the DCWs are as follows:

"1. Preparation of nutritious meals in accordance with the client need and care plan.

2. Bathing, grooming, and general hygiene.

3. Transferring in and out of bed and/or wheelchair.

4. Walking and exercise

5. Monitoring client's conditions.

6. Observing and reporting changes in client's condition.

7. First aid, health and safety.

8. Scheduling and arranging trips for medical care.

9. Picking up prescription drugs.

10. Accompanying client on medical appointments.

11. Accurate documentation of client's liquid intake and toileting.

12. Assisting clients with self-administration of medication.

13. Cleaning the house, changing beds, dusting, mopping, and disposal of trash, washing and ironing of clothes.

14. Ensure client's safety security and well- being in accordance with care plan.

15. Make decisions, solve problems, plus be able to communicate well with co-workers and supervisors.

16. Provide respite care for families in accordance with care plan.

17. Observe clients and their environment and report behavior, physical and /or cognitive changes and/or changes in living arrangements to Supervisor.

18. Observe, receive, and obtain information when working in a team environment."

Direct Care Worker Job Description.

32. The DCWs assist the Clients with tasks such as cooking, cleaning, bathing, dressing, and eating. Initial Training Documents at 2; Job Description.

33. The services are ultimately funded by the Medicaid program through the managed care organizations, which reimburse Intra-National for each hour worked by the DCWs. Khatiwada Depo at 28:2-21.

34. Adhikari obtained a license from the Pennsylvania Department of Health to provide services under the Medicaid Waiver Program. Adhikari Depo at 40:21 – 41:3.

35. Intra-National maintains several Area Offices in various locations in Pennsylvania, including Pittsburgh, Harrisburg, Erie, Philadelphia, Lancaster, and Scranton, that are overseen by Area Managers and also sometimes employ assistant area managers and field staff. Mandatory Annual Training for Direct Care Workers, attached as Exhibit I,  at Bates 34431; Deposition of Khani Sanjel, (hereinafter "Sanjel Deposition") attached as Exhibit J, at 7:11-10:15.

36. Khani Sanjel is an Area Manager in the Pittsburgh Area Office. Sanjel Depo at 7:11-17.

37. Area Managers and Assistant Area Managers at Intra-National's Area Offices oversee the quality of the DCWs' work and respond to any client complaints. *Id.* at 9:6 – 10:17.

38. The Area Managers and Assistant Area Managers report directly to Pokharel and Khatiwada, who also work in the Pittsburgh Area Office. Pokharel Depo at 76:7-16; Sanjel Depo at 8:1-8 and 10:1-17.

39. The DCWs are employees of Intra-National. Complaint, *Intra-National Home Care, LLC, et al. v. United States Secretary of Labor*, Civil Action No. 2:20-cv-1545 (W.D. Pa. 2020) (hereinafter "Declaratory Judgment Complaint"), attached as Exhibit K, at ¶¶ 1, 5, 20, 25, 118, 122, and 129.

40. Since 2015, Intra-National has employed more than 3,000 DCWs in Pennsylvania. Sample Wage and Hour Back Wage Computations, attached hereto as Exh L, Adhikari Depo at 42:24-43:3.

<u>Intra-National Hired and Trained the DCWs</u>

41. Intra-National hired the DCWs. Declaratory Judgment Complaint at ¶ 7; Exh. M Employee Hiring Package.

42. Intra-National employed the DCWs as a third-party agency. Declaratory Judgment Complaint at ¶¶ 1 and 20.

43. Adhikari controlled Intra-National's hiring process. Adhikari Depo at 87:4-16.

44. Adhikari provided written hiring policies to the Area Offices and required them to follow those policies. Pokharel Depo at 90:5-23.

45. Sometimes an individual seeking a position as a DCW would contact Intra-National with a request to work as a DCW. Pokharel Depo at 167:15 – 168:15.

46. Sometimes, a participant in the Medicaid Waiver Program would contact Intra-National and asked to be assigned a DCW. In such cases, Intra-National attempted to find a DCW to care for that potential client. *Id.*; Response to Interrogatory 6.

47. Before hiring a DCW, Intra-National conducted face-to-face interviews with the prospective DCWs, checked two references, conducted a criminal background check, took fingerprints, checked work authorization permits, checks IDs, obtained child abuse clearances, and conducted tuberculosis screenings, among other things. Interrogatory 7; Pokharel Depo at 50:6-22; Employee Hiring Package, attached as Exhibit M, at Bates 000001.

48. For each DCW, Intra-National created an Employee Hiring Package that contained the following documents:

   a.  Employment Application

   b.  Pre-Employment Two Reference Checks

   c.  DCW face to face Interview

   d.  Competency Test

   e.  Provisional Employment/Emergency Hire Affidavit

   f.  Pre-Employment background check Authorization

   g.  Health Screening

   h.  Employment Agreement

   i.  Employment letter/Hire letter

   j.  W-4 Forms

   k.  Employment Eligibility Verification (1-9)

   l.  Job description

   m.  HHA/DCW Certificate

   n.  Training and Orientation Records

   o.  HIPAA Policy and Confidentiality

p.   Sexual Harassment

q.   Confidentiality of Information

r.   Cultural Diversity

s.   Non-Discriminatory Policy for Employment

t.   Equal Employment Opportunity

u.   Standard Precaution for Disinfection

v.   Participant complaint Resolution

w.   Fraud and Financial Abuse Prevention

x.   Conflict of Interest

y.   Attendance and Reporting

z.   Cellular Phone Use

aa.  Termination Policy

bb.  Transportation and Automobile Waiver of Liability

cc.  Occupational Accident Disclosure

dd.  Authorization for Deduction

ee.  Emergency Contact Policy

ff.   Training Policy as per ODA codes and ODM

gg.  Additional Policies and Compliances-CABINET (Signed by DCW)

Employee Hiring Package at 00001 - 58; Pokharel Depo at 128:8 – 129:7.

49. Intra-National trained the DCWs on a monthly, quarterly, and annual basis on topics such as how to take care of the Clients, COVID protocols, timekeeping procedures, and reporting accidents and hospitalizations. Declaratory Judgment Complaint at ¶ 7; Pokharel Depo at 37:1 – 38:19.

50. Since at least 2017, Intra-National provided DCWs with employee handbooks that set forth "the overall guidelines of the company and … what we want our direct care workers to understand about this company services." Pokharel Depo at 141:6-17; 156:18 – 157:22; 172:24 – 173:14.

51. The Employee Handbooks, attached as Exhibits O and P, were up to 124 pages long.

52. Adhikari updated the Employee Handbook annually, with assistance from Khatiwada and Pokharel. Pokharel Depo at 142:17 – 143:20.

53. Intra-National maintained DCW files, including the Employee Hiring Package, "under the close supervision of the Area Manager." *Id.* at 135:17 – 136:3.

54. The Employment Application, which is included in the Employee Hiring Package, included employment history, educational history, work authorization, and references. Employee Hiring Package at Bates 00002 – 00006.

55. The Employment Application also stated that the applicant authorizes Intra-National to investigate the veracity of the application, authorize past employers to communicate with Intra-National and consent to a physical examination including a drug test. *Id.* at Bates 00006.

56. Intra-National's Area Managers or human resource assistants conducted two reference checks before hiring a DCW. Pokharel Depo at 131:11 - 132:12.

57. Intra-National's Employment Agreement with the DCWs stated "[a]pplicant acknowledges not to be seeking employment with any of the agency's clients during an assignment and [for] one year following the assignment," subject to a $3,000 fine for violations. Employee Hiring Package at Bates 000016.

58. Before allowing a DCW to perform in-home care, Intra-National required DCWs to complete an eight-hour initial training, after which Intra-National provided the DCWs with a Certificate of Training Completion signed by their Area Manager. Pokharel Depo at 99:6-101:1; Initial Training Documents.

59. Dilli Adhikari provided the training materials to Pokharel, who provided the materials to human resource assistants and Area Managers, who trained the DCWs. Pokharel Depo at 64:21 – 65:3; DCW Job Description.

60. During training, Intra-National covered up to 18 specific tasks that the DCWs would provide for the Clients, including bathing, dressing, and grooming, but also appointment scheduling, supervising outdoor walks, managing finance, and engaging in social / leisure activities. Pokharel Depo at 101:2-19; Initial Training Documents.

61. Intra-National's Area Managers told DCWs which of these services they would be providing to their respective Clients pursuant to the plan of care and trained them to perform those specific tasks. Pokharel Depo at 101:2-19.

62. Adhikari required Intra-National's Area Managers and human resources assistants to present this training to the DCWs before the DCWs began performing services for Intra-National's Clients. Adhikari Depo at 90:17-92:16; Pokharel Depo at 64:18 - 65:3.

63. Intra-National also provided annual training, consisting of three hours of in person training and three hours of virtual training. Pokharel Depo 173:15 – 174:13; Mandatory Annual Training for Direct Care Workers; Annual Review and Training PowerPoint 2021.

64. Pokharel and Govinda travelled to each Area Office to provide the annual in person training to the DCWs. Pokharel Depo at 37:6-15; 68:2-23; Govinda Depo at 59:16 – 60:20.

65. After the annual training, the DCW was required to pass the Annual Review Competency Assessment with a score of at least 70 percent. Pokharel Depo at 112:16 – 113:20; Mandatory Annual Training For Direct Care Workers at Bates 34525 – 34529.

66. Intra-National retained records of these Assessments, which were normally signed by the employee and either the Area Manager or an Assistant Area Manager. Pokharel Depo at 113:21 – 114:21.

67. Adhikari reviewed the annual training materials that Pokharel developed, sometimes attended the annual trainings, and sometimes provided feedback. Pokharel Depo at 88:1-89:17.

<u>Intra-National Oversees the DCWs' Work</u>

68. Intra-National managed the DCWs. Declaratory Judgment Complaint at ¶ 7.

69. Intra-National maintained an Attendance Policy under which a DCW must call the Area Office to inform their Area Manager or an assistant manager if they need to call out, for example because they are sick. Khatiwada Depo at 51:2 – 7; Employee Hiring Package at 39 – 40.

70. DCWs with questions about the plans of care were trained to seek guidance from their Area Offices. Khatiwada Depo at 47:24 – 48:11.

71. Intra-National trained the DCWs to submit any complaints of discrimination, workplace violence, and sexual harassment to their Area Office. *Id.* at 48:12 – 50:3; 57:15 – 58:3.

72. Intra-National uses a "quality management plan by which Intra-National oversees the quality of services provided by the DCWs." Pokharel Depo at 184:13 – 18.

73. Area Offices employed field staff who visited DCWs at their home worksites. *Id.* at 82:15-83:2.

74. Field staff addressed Client complaints about DCWs and DCW's concerns about the Clients. *Id.* at 83:2-11.

75. Intra-National's field staff visited the DCWs at the Clients' homes for various reasons, including but not limited to visiting clients, providing equipment such as hand sanitizer, gloves and masks, providing the annually revised employee handbooks, and providing interpretation services. *Id.* at 40:1-12; 176:13 – 177:2; Khatiwada Depo at 39:6 – 40:4.

76. Intra-National conducted quarterly reviews with the DCWs at their Clients' homes or by telephone to ensure that the Client receiving the services they were supposed to be receiving under the plan of care and that the Clients were safe and healthy. Pokharel Depo at 115:21-116:16; Khatiwada Depo at 38:16 – 39:5.

77. These quarterly reviews were conducted by Area Managers, assistant area managers, or field staff. Khatiwada Depo at 40:16 – 41:4.

78. During these reviews, the Clients rated the DCWs as poor, average, good, or excellent, and Intra-National retained records of these quarterly reviews for approximately seven years. Pokharel Depo at 117:5-9; 115:21 – 116:7; Khatiwada Depo at 24:3-10 and 40:6 – 41:4.

79. Pokharel and Intra-National's Area Managers and human resources assistants provided additional training on an as-needed basis to address any incidents that are reported, such as accidents, or if a Client was hospitalized. Pokharel Depo at 39:6 – 19. These trainings were provided in the office or in the Clients' homes. *Id.* at 39:20 - 40:12.

80. If Intra-National found a deficiency in the services provided by a DCW, such as not following a plan of care, it required the DCW to correct the deficiency and ultimately had discretion to terminate its relationship with a DCW. Khatiwada Depo at 76:13 – 77:11.

<u>Intra-National Maintains Employment Records</u>

81. Defendants maintained various records, including "time sheet records … file records… [and] complaint records" as well as the activities performed by the DCWs each day. Khatiwada Depo at 17:7-9.

82. Until approximately 2021, DCWs submitted records of the hours that they worked and the tasks that they performed on paper timesheets. Paper Timesheet, attached as Exhibit Q; Subedi Depo at 15:7-15.

83. DCWs provided the handwritten time sheets to Intra-National in one of two ways: (1) they delivered them personally to Intra-National's Area Offices or workstations in Harrisburg, Erie, Lancaster, Philadelphia, Pittsburgh, or Scranton; or (2) Intra-National's field staff would travel to the DCW's workplaces to collect the timecards directly from the DCWs. 30(b)(6) Depo at 7:17-22; 12:8-20; 93:20-22; Interrogatory 1.

84. While the handwritten timesheets were in use, Pokharel and Khatiwada trained the DCWs in person about how to complete the handwritten timesheets. Subedi Depo at 15:7-15.

85. The handwritten timesheets included not only the hours that the DCWs worked but also the services that the DCWs provided. Handwritten Timesheet.

86. The DCW either took the handwritten timesheets to the Area Office in person or one of Intra-National's field staff came to pick it up from the DCW. Subedi Depo at 30:22-25.

87. Then the Area Manager reviewed the handwritten timesheets to make sure they were consistent with the plans of care. *Id.* at 31:1-4.

88. If an Area Manager found an inaccuracy, they would consult with the Client to find out what services were actually provided and when they were provided. *Id.* at 31:17-21.

89. Once the Area Manager determined the correct hours worked and services provided by the DCW, they sent the final paper timesheet to Intra-National's billing department. *Id.* at 31:5-21.

90. The billing department typed the information into an HHA software system, which sent the information to a managed care organization. *Id.* at 31:8-13.

91. The managed care organization then reimbursed Intra-National for those hours at an hourly rate. *Id.* at 31:14-16.

92. Intra-National retained the handwritten timesheets in a paper file in the Area Offices. 30(b)(6) Depo at 14:3-5 and 19:24-20:6.

93. Since the beginning of 2021, Intra-National began tracking its employees' hours using the Electronic Visit Verification ("EVV") system. 30(b)(6) Depo at 15:18-16:4; Khatiwada Depo at 18:19 – 19:20.

94. Intra-National has had access to the all the records in the EVV system since the date it was implemented. Subedi Depo at 34:9-17.

95. "Since the EVV system came into use around the beginning of 2021, Defendants have been able to supervise the workers through the EVV system's location tracking features which help to ensure that the workers are with their care recipients when they claim to be providing the authorized care services." Interrogatory 7.

96. Under the EVV system, the DCW's entered their time into the HHA Xchange system. 30(b)(6) Depo at 95:3-96:23.

97. Under the EVV system, DCWs placed a telephone call from their Clients' residence and/or enter their location into an app with GPS location services to verify that the DCW was at the residence and ready to begin or end their shifts. Subedi Depo at 10:9 – 11:23.

98. If a DCW was unable to verify their location in this way, Intra-National instructed them to contact their Area Manager. Khatiwada Depo at 60:10 – 62:16.

99. The EVV system sent the DCW clock in and clock out information directly to Intra-National and the managed care organization. Subedi Depo at 32:15-17.

100.  The EVV system automatically notified Intra-National if there was a problem with the hours recorded, such as hours being recorded when a Client was hospitalized and not receiving a DCW's services, at which point Intra-National's billing department would confirm with the Client the actual hours worked. Subedi Depo at 32:21 – 34:8.

101.  When Intra-National received a notification from the EVV system, Intra-National reviewed the information to ensure that it was accurate consistent with the plan of care. Khatiwada Depo at 68:11-20; Sanjel Depo at 10:21 – 11:4.

102.  When Intra-National confirmed that a DCW had clocked in incorrectly, for instance clocking in from a location other than a Client's home, Intra-National's field staff bring the DCW a "missed punch form," which was similar to a timecard. Subedi Depo at 12:20 – 13:17. At times, the DCWs picked up the forms at the Area Office. *Id.* at 13:18 – 13:22.

103.  Upon receipt of a missed punch form, DCWs recorded the hours that they actually worked. Subedi Depo at 13:12-14.

104.  Before paying the DCWs, Intra-National downloaded the DCW's hours from the EVV system and provided that information to their ADP payroll service. *Id.* at 81:2-6.

105.  Subedi reviewed ADP's computation of payroll taxes and other taxes that Intra-National withheld from DCWs' wages. Employee Hiring Package at 00016; Subedi Depo at 43:6-19.

<u>Intra-National Made No Effort to Conceal Their Payment of Straight Time for Overtime Until August 2018</u>

106.  Since Intra-National's inception, many of its DCWs have worked more than 40 hours per week. Amended Answer at ¶ 9; Sample Wage and Hour Back Wage Computations; Declaration of Daniel Avolia, attached as Exhibit R; ADP Employee Earnings Records, attached as Exhibit S. Some worked as many as 112 hours per week. ADP records.

107.  Until August 2018, Intra-National's records did not show a premium overtime rate or overtime premium pay for the DCWs who worked overtime. Amended Answer at ¶ 10; 30(b)(6) Depo at 29:14-19; 36:11-24; 42:17-20.

108.  Instead, Intra-National's records clearly showed, on their face, that Intra-National paid the DCWs an hourly rate that ranged from $12.50 to $13.00 per hour for all hours worked, including overtime hours. Amended Answer at ¶ 10; 30(b)(6) Depo. at 29:14-19; 42:17-20.

### Until August 2018, Intra-National Ignored the FLSA's Overtime Requirements

109.  Adhikari has been aware of the FLSA's overtime requirements since at least 2015, having seen labor posters about overtime pay for DCWs and informally discussed the issue with another operator of a home care company. Adhikari Depo. at 12:11 – 13:18.

110.  In 2016, Adhikari and Intra-National met with an unnamed "attorney in Ohio" about the FLSA's overtime requirements, but that attorney only advised him of requirements under Ohio law and advised him to consult with a Pennsylvania attorney regarding his business in Pennsylvania. *Id.* at 103:5-104:17; 106:15 – 107:5; 107:24 – 108:3; 109:3-15; 109:23 – 110:6; 111:3-7.

111.  In January 2017, Adhikari and Subedi consulted with a Pennsylvania attorney named Greg Castelli for about two hours about the FLSA's overtime pay requirements for the DCWs. *Id.* at 111:8-16; 112:1-19.

112.  Castelli told them that the FLSA required them to pay overtime premium pay to the
      DCWs, but Adhikari decided not to follow that advice and instead to seek an opinion from
      a different attorney. Subedi Depo at 95:14-21.

113.  However, Adhikari hired no other attorneys for legal advice about overtime requirements
      for DCWs until June 2018, when he consulted with an experienced FLSA lawyer named
      John Linkosky. 30(b)(6) at 31:24-32:1; 105:1-7; 132:1-2.

114.  Linkosky is an experienced Wage and Hour practitioner. 30(b)(6) at 124:18 – 125:5.

115.  Linkosky began his career with Wage and Hour in 1962 as a trainee in Wilkes-Barre.
      Soon thereafter, he transferred to Baltimore. Deposition of John Linkosky, attached as
      Exhibit T, at 12:18-21.

116.  In 1965, he was promoted to Assistant District Director in Pittsburgh, and, except for a
      brief stint as an ADD in West Virginia, he remained an ADD in Pittsburgh until 1992. *Id.* at
      11:13-13:5.

117.  In 1992, while still working as an ADD, Linkosky obtained his law degree. *Id.* at 13:5-7.

118.  That year, he began practicing law in a sole proprietorship called John Linkosky and
      Associates," focusing primarily on the FLSA and government contracting statutes, *inter
      alia*. *Id.* at 13:11-19.

119.  In 2018, Linkosky began working with Obermayer Rebmann Maxwell & Hippel as a
      consultant. *Id.* at 16:2-12; 15:15 to 19:10.

120.  In that role, Linkosky communicated with Adhikari and Subedi about FLSA compliance
      by email and in person. *Id.* at 29:11-16.

121.  After consulting with Linkosky in April or May 2018, Adhikari understood that the DCWs were entitled to overtime premium pay. Adhikari Depo 127:22-128:24; 175:15-177:6.

122.  At that time, Adhikari also understood that it violated the FLSA to adjust DCW's hourly rates of pay week to week. Adhikari Depo 127:22-128:2; 175:15-177:6.

123.  Defendants continued to pay straight time for overtime on the records but made no attempt to manipulate their records to make it appear as if overtime was being paid, until August 2018. 30(b)(6) Depo at 29:11-19.

### Since August 2018, Defendants Have Manipulated Their Payroll Records to Conceal Their Payment of Straight Time for Overtime

124.  Since August 2018, Defendants' pay practice has primarily consisted of "reducing the workers hourly rates through hourly rate adjustments or miscellaneous pay to establish a new regular rate and then paying time and a half overtime on that established rate for hours worked over 40 in a work week.[1]" Interrogatory 1.

125.  On July 10, 2018, Adhikari met with Khatiwada, Pokharel, and Subedi to develop a new policy for recording overtime hours. 30(b)(6) Depo at 31:9-16.

126.  The policy was to adjust employees' hourly rates based on the number of hours they worked each pay period. Pokharel 98:14 - 99:2.

127.  This policy was formalized in a memorandum called the "Rate Sheet." 30(b)(6) Depo at 31:9-16; Exhibit U Rate Sheet.

---

[1] As discussed *infra*, Intra-National has never computed overtime on a workweek basis; instead, they computed it on a two-week, pay period basis, which is in itself a violation of the FLSA's overtime and recordkeeping requirements.

128.  The Rate Sheet shows a sliding scale for hourly rates that vary with the number of hours

worked in a pay period, like this:

> Anyone who works:
>
> 1 to 6 hours per day shall be paid $13.75 to $14.25 per hour
> 7 to 8 hours per day shall be paid $13.25 to $13.75 per hour plus overtime
> 8 to 9 hours per day shall be paid $12.75 to $13.25 per hour plus overtime
> 9 to 10 hours per day shall be paid $12.00 to $12.75 per hour plus overtime
> 11 to 12 hours per day shall be paid $11.00 to $12.00 per hour plus overtime
> 13 to 14 hours per day shall be paid $10.00 to $11.00 per hour plus overtime
> 15 to 16 hours per day shall be paid $9.00 to $10.00 per hour plus overtime[2]

Exhibit U.

129.  Adhikari, Subedi, Pokharel, and Khatiwada signed the Rate Sheet. *Id.*; Adhikari Depo at

137:15-138:14.

130.  Since August 2018, Defendants have been using the Rate Sheet to adjust the DCWs'

hourly rates inversely with their overtime hours worked. When overtime hours increased,

the hourly rate decreased. And, vice versa, when the overtime hours decreased, the hourly

rate increased. Defendants adjusted the rates after reviewing the hours that the DCWs had

actually worked during the pay period. Defendants then paid time and one half of the

adjusted rate for all overtime hours worked. 30(b)(6) Depo at 36:11-24; 90:18 to 91:1;

Amended Answer at ¶ 1.

131.  Under this process, "reductions to the workers' hourly rates resulted in them receiving the

same hourly compensation in overtime weeks that they received in non-overtime weeks." ,

(hereinafter "Admission"), attached as Exhibit V,  at 18; Declaration of Dan Avolia;

Adhikari Depo at 175:15-21.

---

[2] Most DCWs worked seven days per week.

132. Adhikari, testifying on behalf of Intra-National, explained that Intra-National required its Area Managers to adjust a DCW's hourly rate any time direct care workers' hours changed in accordance with the parameters on the Rate Sheet:

> Q: Are you saying that any time direct care workers' hours change so that they would fall under a different parameter on this Rate Sheet, that the Area Managers were instructed to adjust the hourly rate?
>
> A: Yeah. Everybody has to – we have to follow the system. This is a system that is established. This is the system that everyone has to follow.

30(b)(6) Depo at 90:18 to 91:1; *accord id.* at 98:8 – 98:16.

133. When the Rate Sheet policy took effect, Subedi provided the table from the Rate Sheet to the Area Managers. Sanjel Depo at 13:6-25.

134. Subedi instructed the Area Managers to use the table from the Rate Sheet to "figure out" the DCWs' hourly rates. *Id.* at 14:1-10.

135. Before implementing the Rate Sheet policy, Area Managers spoke with the DCWs in person or by telephone to explain the new policy and that their hourly rate would depend on the number of hours that they worked. *Id.* at 18:17-25.

136. After the Rate Sheet policy took effect, Area Managers totaled the hours worked by each DCW for each pay and sent those hours to the payroll department along with scanned copies of the paper timecards or the EVV data. 30(b)(6) Depo at 17:24-18:23; Sanjel Depo at 14:5-12.

137. Under the Rate Sheet policy, at the end of each pay period, the Area Managers looked at the total number of hours worked by a DCW, determined the corresponding hourly rate in the Rate Sheet, and communicated that hourly rate to the Payroll Department either by mail or by phone. 30(b)(6) at 98:5-16; Subedi Depo at 81:19 – 82:6.

20

138.  The payroll department entered the hours worked for that pay period and the hourly rate into the ADP payroll system. 30(b)(6) Depo at 10:22-11:9; 14:6-17:6; Subedi Depo at 82:7-9.

139.  The ADP system applied that hourly rate to compute any overtime premium pay that Intra-National would pay to the DCW. 30(b)(6) at 98:5-16.

140.  From August 2018 to at least January 2023, Defendants have continued to follow the Rate Sheet system of adjusting the DCW's hourly rates of pay according to the number of hours that they worked in a pay period. 30(b)(6) Depo at 61:21-62:19; 89:2-90:23; Subedi Depo at 58:20 – 60:2; Sample Wage and Hour Back Wage Computations.

141.  While the amounts paid per hour on the Rate Sheet have been amended since 2018, the structure of reducing rates in overtime weeks remained the same. Subedi Depo at 58:20 – 60:2; Sample Wage and Hour Back Wage Computations.

Defendants' Payroll Records Prove that Defendants Paid Straight Time for Overtime

142.  Defendants' payroll provider, ADP, kept Employee Earnings Records for the DCWs throughout the Relevant Period. ADP Payroll Records (Employee Earnings Record for Puspa Subedi for pay periods ending 09/19/21 to 12/22/21, at page 029523).

143.  Defendants' payroll records show that after the Rate Sheet system took effect in August 2018, Defendants have been adjusting the Direct Care Workers' hourly rates inversely with their overtime hours worked. Sample Back Wage Computations; Avolia Declaration.

144.  The records show that Defendants regularly computed overtime premium pay based on the adjusted rates. Sample Back Wage Computations; Avolia Declaration; ADP Records.

145.  Various columns on the Employee Earnings Records reflect the amount that the DCWs were paid and the hours that they worked per pay period. *Id.*

a.  On the Employee Earnings Records, the column labeled "Pay Details" shows a P/E date, which is the date that the two-week pay period ended. This column also shows the pay date, which is the date that the employee was paid, and employee's rate of pay for the first 80 hours of work[3] in the pay period.

b.  The column labeled "Hours Units" shows the number of regular hours and the number of overtime hours worked in the pay period.

c.  The column labeled "Earnings" shows the amount that that Intra-National paid for the employee's regular hours and the amount that Intra-National paid for the overtime hours.

d.  The column labeled Gross shows the employee's gross pay, which was normally the sum of the amounts in the Earnings column. *Id.*

146.  For example, the payroll summary from ADP for Puspa Subedi, *id.*, shows an hourly rate of $12.75 for the pay date 10/1/2021. ADP Payroll Records at p.1.

147.  That pay period, Puspa Subedi worked 80 regular hours and 10.75 overtime hours. *Id.*

148.  Intra-National paid $1,020.00 for the regular hours, reflecting the stated hourly rate of $12.75 for the 80 non-overtime hours worked ($12.75 * 80 = $1,020.00). *Id.*

149.  Intra-National also paid $205.59 for the 10.75 overtime hours. *Id.*

---

[3] For the purposes of this motion, DOL refers to the first 80 hours of work in a two-week pay period as regular hours or non-overtime hours. This is because, although the FLSA requires premium overtime pay for hours over 40 in a single workweek, Defendants kept these records on a bi-weekly basis, treating the first 80 hours in a two-week pay period as non-overtime hours.

150. Although the Employee Earnings Record did not show the overtime rate, dividing the overtime compensation of $205.59 by the 10.75 overtime hours worked shows an overtime rate of $19.13[4], which is 1.5 times the hourly rate of $12.75. Declaration of Dan Avolia.

151. The next pay period, Puspa Subedi worked 12 overtime hours and the hourly rate decreased to $12.68. ADP Payroll Records at p.1.

152. The next pay period, Puspa Subedi worked 56 overtime hours and the hourly rate decreased to $11.20. *Id.*

153. The next pay period, Puspa Subedi worked 44 overtime hours, and the hourly rate increased to $11.47. *Id.*

154. The next two pay periods, Puspa Subedi worked 46 overtime hours, and the hourly rate decreased to $11.42. *Id.*

155. During the final pay period on this Employee Earnings Record, for Pay Date 12/22/21, Puspa Subedi worked 35 hours of overtime, and the hourly rate increased to $11.72. *Id.*

156. For each of these pay periods, Subedi's gross pay divided by total hours worked was $13.50. Avolia Declaration.

157. In other words, Intra-National paid Subedi $13.50 per hour for all hours, regardless of the number of overtime hours worked. *Id.*

158. To take just one other example, Indra Bhattarai's hourly rate was adjusted four pay periods in a row inversely with her overtime hours worked. In two pay periods that she worked no overtime, Intra-National paid her $13.00 per hour. ADP Payroll Record at p.2.

---

[4] The exact figure is $19.125, but for simplicity's sake this memorandum rounds monetary figures to the nearest penny.

159. In two pay periods that she worked 144 hours of overtime, Intra-National paid her $9.84 for her first 80 hours worked and $14.76 for hours over 80 in the pay period, but her average rate per hour was still $13.00 per hour. *Id.*; Avolia Declaration.

160. In two pay periods that she worked 88 hours of overtime, Intra-National's records show that she received $10.31 per hour plus overtime, but her average rate was still $13.00. In other words, Intra-National paid Bhattarai $13.00 for each hour that she worked, whether they were overtime hours or not. ADP Records at p.2; Avolia Declaration.

161. Some of Defendants' Employee Earnings Records showed Defendants keeping hourly rates the same when overtime hours varied but deducting amounts from employees' overtime premium pay and referring to those deductions as "MP," or "miscellaneous pay." ADP Records at p.3.

162. For example, the Employee Earnings Record for Bhakti Basnet shows an hourly rate of $13.00 per hour for pay date 7/10/20. ADP Payroll Records at p.3.

163. For this pay date, the record shows 46 hours of overtime and $897.00 in overtime pay, equating to an overtime rate of $19.50. That rate is time and one half the $13.00 hourly rate shown on the record. *Id.*

164. But Intra-National deducted $299.00 as "miscellaneous pay." *Id.*

165. After this deduction, Basnet's gross pay divided by hours worked was $13.00 per hour. In other words, after applying the deduction, Basnet was paid her $13.00 per hour regular rate for all hours worked, including overtime hours. *Id.*; Avolia Declaration.

166. Basnet did not work overtime for the next five pay periods. She earned $13.00 per hour. *Id.*

167.  Basnet therefore received $13.00 per hour in her overtime pay period and $13.00 per hour in her non-overtime pay periods. Avolia Declaration.

168.  Intra-National's payroll records sometimes kept the hourly rate shown on their records for the first 80 hours consistent from workweek to workweek, but the total amount shown as being paid for those hours – which should have been 80 times the indicated hourly rate – actually reflected a different hourly rate. ADP Payroll Records at p.3; Avolia Declaration.

169.  For instance, for pay dates 12/26/21 to 3/30/22, Intra-National's Employee Earnings Record shows that Rathana Hak worked between 4 and 46 hours of overtime per pay period. The record also states that Rak's hourly rate was $9.79 per hour for her first 80 hours of work each pay period. ADP Payroll Records at p.3.

170.  If Intra-National had actually paid $9.79 per hour for the first 80 hours of work, it would have paid Rak $783.20 in Regular Earnings each pay period ($9.79 per hour times 80 hours is $783.20). But Intra-National actually paid Rak amounts varying $930.99 to $1,075.26 in Regular Earnings during these periods. Avolia Declaration

171.  Regardless of the number of overtime hours Rak worked, Intra-National paid this DCW $12.75 per hour for all hours including overtime hours. Avolia Declaration.

172.  Regardless of the technique used, since August 2018 Intra-National engaged in a pattern of paying employees the same average rate of pay for all hours worked, including overtime hours. Avolia Declaration.

<u>Defendants Ignored Legal Advice After June 2018</u>

173.  Linkosky did not tell Defendants that the DCWs were exempt from overtime under the companionship exemption. Linkosky Depo at 63:2-8.

174. Linkosky did not tell Defendants that the DCWs were exempt from overtime under the live-in exemption. *Id.*

175. Defendants continued to work with Linkosky as a consultant through at least December 2, 2022. Adhikari Depo at 139:9-18; 141:16-18.

176. But Defendants did not show Linkosky the Rate Sheet until December 2022, while preparing for a deposition in this lawsuit. Adhikari Depo at 139:9-18; 141:16-18.

177. No attorney ever advised Defendants that the Rate Sheet complied with the FLSA, Admission 20; Adhikari Depo at 137:11-14.

178. Referring to himself and Subedi, Adhikari testified "we had to figure out the total of the gross amount we had been getting from the state in the form of reimbursement for the services we rendered to the consumer [Client]. And based on that gross amount, we calculated. We did the mathematics." 30(b)(6) Depo at 44:22 - 45:2.

179. Adhikari testified that "everyone is doing the same thing following each other and many of them are following us because we started that. Everyone started that, doing the same that I think what we are doing. Hundreds of law firms, hundreds of agencies and doing the same thing, entire states doing I think the same thing." Adhikari Depo at 183:17-184:14.

180. Adhikari also testified that "no one is following the rules" regarding overtime compensation for DCWs. *Id.* at 185:21.

<u>Wage and Hour's Investigation</u>

181. On December 9, 2019, Wage and Hour Investigator Daniel Avolia sent a letter to Intra-National informing it that Wage and Hour would be investigating Intra-National. Avolia Declaration.

182.  On December 18, 2019, Avolia spoke with Linkosky about scheduling the investigation. *Id.*

183.  On January 10, 2020, Avolia traveled to Intra-National's office in Pittsburgh and conducted the initial conference with Linkosky. *Id.*

184.  On January 20, 2020, Avolia reviewed some of Intra-National's payroll records. *Id.*

185.  On February 3, 2020, Wage and Hour Assistant District Director Brian Heeter, who was Avolia's supervisor, sent an email to Linkosky explaining the rate-manipulation problem that Wage and Hour had identified: "Manipulation of rates**:** the payroll records show that certain employees' rates were changed depending on the number of hours they worked that week / pay period. For example, the more hours they worked, the lower the rate of pay they received. This practice resulted in the payment of ST for OT [straight time for overtime]." Declaration of Brian Heeter, (hereinafter "Heeter Declaration,") attached hereto as Exhibit W; Emails between Heeter and Linkosky, attached hereto as Exhibit X, at page 4.

186.  On February 3, 2020, during a telephone call with ADD Heeter, Linkosky agreed to produce pay records for a three-year willful period. Heeter Declaration.

187.  On June 10, 2020, Linkosky emailed Adhikari stating that Subedi told him that Intra-National had been in compliance for 22 months, but that Linkosky planned to review the payroll records to verify that assertion. Emails Between Heeter and Linkosky.

188.  On June 22, 2020, Linkosky sent an email to Subedi describing an employee who was paid $12.50 in a non-overtime week but whose hourly rate was lowered in an overtime week such that the employee was still making $12.50 per hour overall. Linkosky asked "Was it the policy to pay the lower rate when there was overtime, and the higher rate when

there was no overtime?" Emails Between John Linkosky and Meg Subedi, attached as

Exhibit Y.

189.  Subedi did not respond to Linkosky's question. Linkosky Depo at 95:7-16.

190.  On June 22, 2020, Linkosky sent an email to Heeter acknowledging that "a falsification

scheme would involve the rate varying with the overtime hours to yield the same gross

wages." Emails between Heeter and Linkosky at page 4.

191.  On June 24, 2020, Heeter called Linkosky and described examples of Intra-National

manipulating hourly rates to pay straight time for overtime. Emails Between Heeter and

Linkosky at 001143; Heeter Declaration.

192.  On August 13, 2020, ADD Heeter called Linkosky to advise him that Wage and Hour had

found a consistent pattern of rate manipulation in the payroll records. Heeter Declaration;

Emails Between Heeter and Linkosky at 001146.

193.  On October 2, 2021, Linkosky emailed Subedi again and asked "[h]as Intra National

stopped reducing the regular rate when more than the scheduled hours are worked by a

DCW at all locations, and if so, when?" Emails Between Heeter and Linkosky; Linkosky

Depo at 73:10-76:4; 81:6-17.

194.  After that email, Linkosky did not receive information about whether Intra-National had

corrected the problem. Linkosky Depo at 95:7-15.

195.  On October 13, 2021, Linkosky spoke with Adhikari and stated that Wage and Hour

found this practice to violate the FLSA. Linkosky Depo at 81:18 to 82:19.

196.  Adhikari replied "well, we've got to do something about that." *Id.*

197.  During this conversation, Adhikari became "obviously angry." *Id.* at 82:20-83:10.

198.  Linkosky does not recall ever telling anyone at Intra-National that their pay practices complied with the FLSA. Linkosky Depo at 75:24 to 76:4.

Wage and Hour's Back Wage Computations

199.  To compute back wages, Wage and Hour began with Defendants' payroll records produced in electronic format by ADP. Avolia Declaration.

200.  Wage and Hour put the data into an Excel spreadsheet, Columns A through N. Wage and Hour Back Wage Computations; Avolia Declaration.

201.  Wage and Hour computed the hourly rate paid for each employee for each pay period by dividing the employee's gross pay (Column G) by the number of hours worked that pay period (Column J). The results appear in Column N. *Id.*

202.  Using this methodology, Wage and Hour determined that Intra-National was paying the same hourly rate for all hours worked by the DCWs regardless of the number of hours that they worked in a pay period, including overtime hours. *Id.*

203.  Wage and Hour labeled Column N "Intended Rate," which is the hourly rate that Wage and Hour used as each employee's regular rate in computing the back wages owed. Avolia Declaration. *Id.*

204.  Wage and Hour computed back wages for each employee through January 2023 using the same methodology. First, gross pay was divided by hours worked to obtain the regular rate. Next, half time was computed for all hours worked over 80 in a pay period. *Id.*

205.  After determining the regular hourly rate for the employees, Wage and Hour computed back wages by multiplying the overtime hours worked by .5 times the employees' regular rates of pay. *Id.*

206.  Wage and Hour computed $47,319,237.63 in unpaid overtime from October 15, 2018

through January 31, 2023. *Id.*; Back Wage Computations Summary attached as Exhibit Z.